## IN RE ESTATE OF J. H. SCHOFIELD, Deceased.

**WILLS:** Construction—Power of Executor to Lease. The power of an executor to lease real estate may be inferred from the fact that the executor is charged with the duty of handling and disposing of the rents and profits arising from such lands. Will reviewed, and *held*, the power to rent and handle the proceeds was in the executor and not in a legatee. (See Sec. 3336, Code, 1897.)

*Appeal from Cass District Court.*—A. B. THORNELL, Judge.

MONDAY, JANUARY 15, 1917.

THIS action involves the proper construction of a will; involves a controversy between the executor of the will and a legatee named in the will, over the right to rent certain real property disposed of in the will. The opinion states the facts.—*Affirmed.*

*Popham & Havner,* for appellant.

*W. C.* and *T. J. Bryant,* for appellee.

GAYNOR, C. J.—On the 24th day of October, 1913, J. H. Schofield died, testate. His will was duly probated on October 3, 1913. Laura M. Andresen and A. G. Arrasmith were appointed executors of the will. The will reads as follows:

"First. It is my will and I direct that

all just debts be first paid, including indebtedness on real estate, and I direct that all personal property that I may own at the time of my death be converted into cash and first used for that purpose, and all land sold and the proceeds applied in the payment of debts, if needed, and any and all other real estate that I may own at the time of my death shall be sold and applied as above directed, except any town property that I may own in Griswold, Iowa, and also excepting the land that I now own in Sections 27 and 28, Township 75, Range 38, West, in Pottawattamie County, Iowa.

"Second. I give, devise and bequeath to my grandson, George Andresen, $200 per annum, the first payment to be made March the first after my death, and the last to be made March first, 1927, the same to be paid from the rents and profits and income from the real estate that I may own at the time of my death in Sections 27 and 28, Township 75, Range 38, West, and I direct my executors, hereinafter named, to place this annual payment at interest annually, and that the same be used for the schooling and education of my said grandson, that is, that both principal and interest shall be used for that purpose, and whatever may remain over of this sum that is not so used shall be paid to him by my executors on the first day of March, 1927.

"Third. I give and bequeath to my daughter, Laura Andresen, the use, rents and profits and income from the east half of Section 28, and the southwest quarter of Section 27, Township 75, Range 38, West, and all other land that I may own in said sections until the first day of March, 1927, excepting the sum of $200 hereinbefore devised to my grandson George Andresen, and excepting sufficient of said income to pay the taxes on said land, and the interest on a loan that may be on said land, and the keeping up of the usual and ordinary repairs, which shall be paid by my executor hereinafter named.

"Fourth. After the expiration of the estate to my daughter March first, 1927, and to my grandson, I give, de-

vise and bequeath to my son, George H. Schofield, and my daughter, Laura M. Andresen, and my grandson, George Andresen, share and share alike, the proceeds of the land described in paragraph three of this will, and direct that the same be sold by my executors and the proceeds divided equally among them.

"Fifth. I give, devise and bequeath to my daughter, Laura Andresen, the use, rents and income of any property real, that I may own at the time of my death in the town of Griswold, Cass County, Iowa, until the first day of March, 1927, and also all household goods that I may own at the time of my death, and after the expiration of the estate for years hereinbefore given to my daughter, I then give, devise and bequeath to her any real estate that I may own in the town of Griswold, Iowa, absolutely and in fee simple.

"Sixth. It is my will and I direct that, in case any mortgage on the land herein described shall become due and payable before the first day of March, 1927, and should there be no fund available to pay the same, I direct that my executors hereinafter named shall have power to execute a new mortgage on said land for the purpose of paying any such indebtedness that may have matured and become payable, and I hereby empower them to execute such mortgage without the order or approval of the court.

"Seventh. If, after the payment of debts, including indebtedness on real estate, interest and taxes, and the specific devise herein made to my grandson, George Andresen, there should be anything left, I give, devise and bequeath the same, share and share alike, to my son, George Schofield, and my daughter, Laura M. Andresen, and my grandson, George Andresen.

"Eight. I hereby name and appoint as my executors herein my daughter, Laura M. Andresen, and A. G. Arrasmith, and direct that they be not required to give bond."

The controversy has arisen between Laura M. Andresen, in her individual capacity, and the executor of the will, over

the right to rent and receive the rents and profits from the land in Sections 27 and 28, mentioned in the will. Laura Andresen claims the right under the third clause of the will. She claims that by this she was given an estate for years in the land, and that, as an incident to this, she had the right to make the lease in controversy.

Under this claim, she presented to the district court, for approval, a lease executed by her on the 29th day of August, 1914, in which she undertook and agreed to rent the land described in Sections 27 and 28 to one Rogers, for a term of years commencing March 1, 1915, and ending March 1, 1920. There is no controversy as to the terms of the lease. The rental was to be paid in cash to Laura Andresen.

Objections were filed by her co-executor, claiming that the right to lease said land rested in the executors of said will jointly; that the will did not grant to Laura Andresen a freehold interest in the land, carrying with it the right to occupy and let the land; that it gave her simply the right to enjoy a portion of the income from said land until March 1, 1927. She relies for the exercise of this right upon the provisions found in the third clause of the will. If she has the right, it must be found there. In construing any part of a will, however, the whole will must be considered. So it becomes necessary, in determining whether this third clause gives her the right which she claims, that we consider, not only this third clause, but all the provisions of the will, to the end that the intent of the testator may be gathered and enforced.

Section 3336 of the Code of 1897 provides:

"When the interests of creditors will not thereby be prejudiced, a testator may prescribe the entire manner in which his estate shall be administered . . . and prescribe the manner in which his affairs shall be conducted until his estate is finally settled, . . . "

To the will, therefore, we must look, and by the will we must be guided, when called upon to determine the manner

in which the estate shall be administered, the manner in which the affairs of the deceased shall be conducted until his estate is finally settled. When the will is clear and free from all ambiguity, and the intent of the testator is clearly made manifest by the terms and wording of the will, courts find no difficulty in ascertaining and following the testator's directions. Time was when instruments of this character were drawn by men skilled in this line of work, and familiar with the technical use of words expressive of the thought of the testator, and then the technical meaning was intended, and, in searching for his intent, the words were so understood. But in these days, when instruments of this character are loosely drawn, and by men not skilled in the use of technical terms, we have not this aid in arriving at the real intent of the testator. It is always difficult to understand one who is loose in the use of words, careless in selecting the words that express clearly his meaning. This is what confronts us here, and it is necessary for us to go to the whole will to find what the testator intended by this third clause.

It will be noted that the second clause gives to the grandson, George, $200 per annum. It will be noted that it directs that this be paid by the executors out of the rental from the land in controversy; that this be placed at interest by his executors, and that both principal and interest be used by them for the education of the boy; that, if any of this $200 and interest be left in their hands on the 1st of March, 1927, the executors pay this to him. This sum, provided for, was intended to go to the executors out of the rental of this land. It is the only source from which this revenue is to be derived. It is to be by the executors placed on interest for the boy; paid out as his needs require for the purposes indicated; and the balance, if any, to be paid to him at the expiration of the period.

The third clause,—the one in controversy,—gives to the daughter, Laura, the use, rental, profits and income of this

same land until March 1, 1927; but not all the rent, profits and income; for it appears that from this gift was excepted so much of the income as was necessary to pay taxes, to pay the interest on the mortgage on the land, and to keep up the usual and ordinary repairs. This portion of the income, rental and profits, undoubtedly, was intended to pass to the executors; for out of this income so reserved these sums were to be paid by them. They (the executors) were charged with the duty of paying out of the rents and profits of this land this $200 given the boy, the interest on the mortgage, the taxes, and all sums necessary to keep up the usual and ordinary repairs. It is apparent that there was not given to the daughter all the rents, profits and income, but only what remained after the discharge of these obligations imposed upon the executors.

Much stress is laid upon the word "use," and we are importuned to give it its technical meaning. By this word it is claimed an estate for years was created for Laura; that, as an incident to the creation of this estate, the duty to pay taxes, to pay the interest on the mortgage, and to keep up the repairs, devolved upon her as a matter of law.

It may be conceded, nothing further appearing, that, if the will read, "I give, and bequeath to my daughter, Laura Andresen, the use, rent, profits and income from the land until the 1st day of March, 1927," this would give to her an estate for years. This, when accepted, would impose upon her the duty of paying taxes, interest on the mortgage and keeping up the usual and ordinary repairs. This would follow as an incident to the grant. But he removes this as an incident to the gift. He places this obligation not upon her by virtue of a grant, but upon his executors, and reserves to the executors, from the rents and profits, so much of the rent and profits as is necessary to discharge this duty. The bequest to George is not made a direct charge upon the land. It is to be paid out of rents, profits and income from the land.

No burden is imposed upon Laura to pay this, or any of the sums reserved. All these are imposed upon the executors, and to be discharged by them out of the rentals.

It would appear from the fourth clause of the will that the testator intended, and his purpose was, to keep the estate open, to keep the executors appointed by him in charge of the estate until March 1, 1927; for, upon the arrival of that date, he directs his administrators to sell this land and divide the proceeds equally among his son, George, his daughter, Laura, and his grandson, share and share alike. The same purpose is indicated in the sixth paragraph, for therein he provides that, if any of the mortgages on the land mature before the 27th day of March, these executors shall have power, without order of the court, and without the court's approval, to mortgage this land to pay such indebtedness. The land in controversy was mortgaged for $17,000.

Much stress is laid in argument upon the wording of the fifth clause in the will; but this cannot aid us in the solution of the difficulty, for the reason that the fifth clause deals only with property in Griswold. It does not attempt to deal with the property in controversy. It gives to the daughter, Laura, the use, rental and profits of the real estate in Griswold until the 1st day of March, 1927, and then gives to her the entire estate in this Griswold land, absolutely and in fee simple, upon the expiration of that date.

In *McCall v. Peachy's Admr.*, 3 Munf. (Va.) 288, the Supreme Court of Appeals held, in substance, that, where a testator in his will directs that certain moneys arising from the rentals of land be placed out at interest, his executor is impliedly authorized to make leases of the land. This is so apparently right that it would seem not to need authority; because if, by the will, he places upon his executors certain burdens to be discharged from the rentals of the land, it would seem that the further power to collect the rentals should be inferred, and to this end, to make leases, that rentals

might come to them, to meet the obligation imposed upon them to be discharged out of rentals.

It will be noted that nowhere in this will does the testator undertake to make a final disposition of the land in controversy, except as we find it in the fourth clause. In this clause he directs them to sell the land in controversy and divide the proceeds equally among the parties named in the clause. If they are empowered to sell, an incident to this power is a right to convey a title, and this suggests a purpose to invest them with power to manage and control the estate until such time as they are authorized to make the sale. It is true that, at common law, this power does not vest in executors or administrators by virtue of their appointment. It is also true that this power may be given them by the instrument appointing them, and it is also true that the power to lease may be inferred from the fact that they are charged with the duty of handling and disposing of the rents and profits arising from such lands.

It is our thought, from the whole record, that there never was in the mind of the testator a purpose to carve out a lesser estate and invest it in this claimant for years, or otherwise; that the thought of the testator, as appears from the whole instrument, was that the land should be managed and controlled by his executors until such time arrived as they were authorized, under the will, to make final disposition; that these obligations, imposed upon them by the will, invested them with the power to manage and control the property which was set apart by the will as a source from which the revenue should come to them with which to discharge these obligations. It was given to them to carry out the purpose and scheme of the testator in the disposition of his property. This purpose and scheme are made manifest by the will itself. Until 1927, the income of the property was the only source of revenue out of which the obligations imposed were to be discharged. After 1927, the further duty was imposed upon

them to sell this property and divide the proceeds, and then, as a final consummating act of all, it was said, in the seventh paragraph, that if, after the payment of debts, including debts on the real estate, interest and taxes, and the specific devises made, there should be any left, it should be equally divided among the three, the son, the daughter, and the grandson.

Upon the whole record, we think the court was right in holding that the power to control and lease and to collect the rents and profits from this land was invested by the will in the executors; that plaintiff had no right, in her individual capacity, to make the lease in question and appropriate the rents and profits to her own use. The court so held, and its action is—*Affirmed.*

LADD, EVANS and SALINGER, JJ., concur.